[Crim. No. 12688. Fourth Dist., Div. Two. Dec. 23, 1981.]

THE PEOPLE, Plaintiff and Appellant, v.
LOUIS MARIN GALLO, Defendant and Respondent.

COUNSEL

Cecil Hicks, District Attorney, Michael R. Capizzi, Assistant District Attorney, William M. Bedsworth and Randell L. Wilkinson, Deputy District Attorney, for Plaintiff and Appellant.

Garey & Bonner and Michael Ian Garey for Defendant and Respondent.

OPINION

MORRIS, J.—Defendant was charged with possession for sale (Health & Saf. Code, § 11351) and sale of heroin (Health & Saf. Code, § 11352), with a special allegation of possession of more than one-half ounce of heroin (Pen. Code, § 1203.07, subd. (a)(1)). He was held to answer in superior court where the court granted defendant's motion to dismiss pursuant to Penal Code section 995. The People appeal.

Rick Dunton, an informant for the Placentia Police Department, testified that he had known defendant for approximately four weeks prior to March 5, 1980, and had visited him at his house about five times that day. On one of his visits he gave defendant $100 for a balloon of heroin. Defendant told Dunton that he would have to get the heroin from someone else and that Dunton should return for it in about a half hour. Dunton returned at the appointed time and defendant gave him a balloon, which Dunton passed on to an investigator for the Placentia Police Department. Dunton had received the $100 from the Placentia Police Department.

Dunton further testified that on March 12, 1980, he contacted defendant on four occasions at defendant's house. On one of those occasions he gave defendant another $100, was told to return in one-half hour, and subsequently received another balloon of heroin, which he gave to a Placentia police officer.

Dunton testified that each time he went to defendant's residence he entered through an open garage door and contacted defendant through a screen door at the back of the garage. Dunton never entered the residence itself, but met with defendant either in the garage or on the driveway.

Although Dunton never told anyone that he had seen any heroin in the residence, he did tell Officer Rowley that he did not believe that defendant had to leave the house to get the heroin, because it would have taken longer than the one-half hour to retrieve it from Ontario or Redlands, where it was said to be located.

Dunton admitted that he had two felony convictions for robbery, one in 1973 and one in 1974; that he served eleven months in prison for a probation violation; that he was released on parole in November 1978; that he remained on parole until November 1979, and that he did not use heroin while he was on parole.

When Dunton was asked whether he used heroin after he was off parole, he asserted his Fifth Amendment privilege against self-incrimination. The court sustained Dunton's assertion of the privilege against defense counsel's contention that because Dunton had answered similar questions at an earlier preliminary hearing, he had waived the privilege. The court also rejected a defense motion to strike Dunton's direct testimony, stating that the witness' testimony at the prior hearing could be read into the record.

Dunton admitted that felony burglary charges were pending against him based on an incident in February 1980, and that it was after his detention for that incident that he began serving as a police informant for Officer Rowley. However, when asked if between January 1, 1980, and March 13, 1980, he had been earning his livelihood by means of theft, he again asserted his privilege. The claim of privilege was sustained, defendant's motion to strike direct testimony was denied and Dunton's prior testimony was read into the record.

Dunton also testified about his February detention for burglary; his discussions with officers Rowley and Holcomb about becoming an informant; the fact that defendant's name was mentioned as a person in whom the officers were interested; of Dunton telling them "I can do Gallo"; his subsequent agreement to work with them for which he was to be paid $25 for heroin purchases, but would be paid $100 for the defendant, and that he had been paid $100 for his efforts on March 5 and March 12 prior to the time he appeared before Judge Petty for issuance of a search warrant on defendant's residence.

Dunton asserted his Fifth Amendment privilege to questions whether he was under the influence of a drug when he appeared before Judge Petty; whether he had told Rowley that he had been supporting his heroin habit by means of theft; whether he was "good for" the burglary charges pending against him; and whether one of the items seized from defendant's residence pursuant to the search warrant was something Dunton had previously stolen. In each case the claim of privilege was allowed, a motion to strike direct testimony was denied, and prior testimony was read into the record.

At some point during Dunton's testimony, defense counsel requested Dunton's address so that a further investigation could be carried on regarding his character, his living arrangements and any contacts with the police at his home. The request for disclosure was denied, although there was no evidence that Dunton had been threatened or would be endangered by revealing his address.

Officer Rowley of the Placentia Police Department was conducting a surveillance of defendant's residence on March 5, 1980, and again on March 12, 1980, during the times Dunton visited the residence and purchased the heroin. On both occasions he monitored the conversations between Dunton and defendant, by means of a wire transmitter, and

heard someone tell Dunton to return in one-half hour because he would have to get the "stuff" from Ontario. Rowley continued to observe the residence from about 200 yards from defendant's house. On the March 5, 1980, occasion no one left the residence between the times Dunton left and returned to pick up the balloon of heroin, and only defendant's son arrived during that period. On March 12, 1980, no one either left the residence or visited the residence between the times that Dunton left and returned for the heroin.

Rowley testified that when Dunton appeared before Judge Petty for the issuance of the search warrant, the judge was informed that Dunton had been to prison for robbery, that he was a "user" and had a pending burglary case. Rowley further testified that at the time he obtained the search warrant he was not aware that Dunton was supporting his heroin habit by stealing and did not attempt to conceal Dunton's criminal record.

On March 14, 1980, Detective Rodarte and other officers of the Placentia Police Department served the search warrant. Rodarte and another detective entered through the open garage door, and went to the door that led from the garage to the house. Other officers went to the front door. Rodarte knew defendant and had helped construct the dining room of defendant's house. He had been to defendant's residence on at least three prior occasions and had never seen anyone enter except through the garage. He had entered through the garage door on at least one occasion. When he approached the screen door leading into the house, he was able to see four persons seated at a table. He announced himself three times and knocked on the door each time. After about 30 seconds and receiving no response, he opened the screen door and entered the residence. He then saw defendant, who was seated at a table in the back of the house, and showed him the arrest and search warrants.

The parties stipulated that a total of 44 balloons found in the house contained 37.9 grams of heroin.

The Penal Code section 995 motion was granted on the ground that the nondisclosure of the witness' address, coupled with the restriction on cross-examination occasioned by the witness' assertion of the privilege against self-incrimination, resulted in a denial of a substantial right.

The People contend that defendant was not entitled to a dismissal on any of the grounds asserted in his motion to dismiss pursuant to Penal Code section 995.

Those grounds were that defendant Gallo was unlawfully committed because: (1) he was erroneously denied disclosure of Dunton's current address; (2) he was denied a substantial right by the restriction of the cross-examination of the witness by reason of the assertion of his privilege against self-incrimination; (3) the manner of execution of the search warrant violated Penal Code section 1531; and (4) the search was invalid because the affidavit in support of the warrant contained intentional omissions and misstatements of fact.

### 1. *Disclosure of informant's address.*

In *People* v. *Mardian* (1975) 47 Cal.App.3d 16 [121 Cal.Rptr. 269], this court held, under circumstances similar to the present case, that the defendant was not denied a substantial right even though the trial court denied his request for a witness' address. In *Mardian* a prosecution witness testified against the defendant, and was shown to be a drug user, a convicted felon and a police informer. The court stated, "While the Supreme Court has held that prejudice may result when a defendant is forbidden from asking a witness his current address [citations] prejudice does not always or necessarily result. In *Alford* the court reasoned that '[p]rejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them.' [Citation.] [¶] Thus, the Sixth Amendment requires, at a minimum, that a prosecution witness' testimony be placed in proper perspective, and to the extent that a witness' address may aid in properly placing this testimony, it is a constitutionally protected subject of cross-examination—but the Sixth Amendment does not accord a defendant a right to demand to know the address of each and every prosecution witness. [Citation.] And federal courts have held that denial of defense inquiry into a witness' address is not error where defense counsel has already clearly placed that witness 'in his proper setting.' [Citations.] [¶] In the case at hand, defense counsel placed Kenneth Donahue in his proper setting without resort to inquiry regarding his current address: on cross-examination counsel established that the witness had been granted immunity; used drugs; was a convicted felon; had sold narcotics; possessed an illegal weapon; and was working as a police informer. Such information gave the jury sufficient environmental background re-

garding this witness to accurately weigh and assess his testimony. [¶] Hence, defendant was not denied his Sixth Amendment right to effectively cross-examine this witness against him." (*People* v. *Mardian, supra*, 47 Cal.App.3d at pp. 40-41; see also *People* v. *Castro* (1979) 99 Cal.App.3d 191, 202-204 [160 Cal.Rptr. 153].)

■ In the present case, defendant established that Dunton had been convicted of robbery, used heroin, had committed theft to support his heroin habit, had a pending burglary case, and was a paid police informant. This information certainly gave the magistrate sufficient background to place the witness in his proper setting.

Moreover, in this case there existed corroboration, i.e., the observations of Officer Rowley and the quantity of heroin found in defendant's residence when the search warrant was executed. In *People* v. *Benjamin* (1975) 52 Cal.App.3d 63, 75 [124 Cal.Rptr. 799], the court suggested that disclosure of the witness' address was not essential to a fair trial where the witness' testimony was corroborated.

Defendant contends that *Miller* v. *Superior Court* (1979) 99 Cal. App.3d 381 [159 Cal.Rptr. 456], mandated the granting of the Penal Code section 995 motion. In *Miller*, as in the present case, the informant witness was asked his address on cross-examination. The trial court denied a motion under Penal Code section 995, and the Court of Appeal granted a writ of prohibition, stating: "Defendant's request for the informant's address was proper and should have been granted. The fundamental right of cross-examination includes eliciting the address of a witness in order that 'the witness may be identified with his community so that independent testimony may be sought and offered of his reputation for veracity in his own neighborhood' and that 'facts may be brought out tending to discredit the witness by showing that his testimony in chief was untrue or biased.' [Citation.] The right to a full and fair preliminary hearing includes these rights. . . . [¶] Here, as in *People* v. *Brandow*, 12 Cal.App.3d 749 [90 Cal.Rptr. 891], *People* v. *Mascarenas*, 21 Cal.App.3d 660, 666 [98 Cal.Rptr. 728], and *Alford* v. *Superior Court*, 29 Cal.App.3d 724 [105 Cal.Rptr. 713], the case involved a single informant witness whose credibility was central to the defense. Although significant cross-examination took place at the preliminary hearing (including a recent arrest for substantial narcotics charges, past purchases and sales of narcotics and the informant's motive to lie), the denial of the informant's address, for no reason, deprived the defense of a full opportunity to test the weight and credibility of the

witness. The possible additional impeachment via the witness' bad reputation for veracity or for extensive narcotics dealing might well have tipped the scales of veracity and resulted in the magistrate's disbelief of the witness and refusal to bind over the defendant. Defendant was entitled to a preliminary hearing wherein the veracity of the witness was fully and properly tested after revelation of properly discoverable information about the informant." (*Miller* v. *Superior Court, supra,* 99 Cal.App.3d at pp. 385, 386-387.)

Defendant argues that here, as in *Miller*, the People failed to produce any evidence that the disclosure would endanger the witness. While it is true that there was no evidence of any specific threats, or of any specific danger, the informant's fear cannot be entirely discounted in evaluating the magistrate's determination that the defendant's need for disclosure in this case was outweighed by the potential danger to the witness who was engaged in assisting the police in identifying persons dealing in illegal narcotics. Defendant was not the only individual identified by Dunton as a dealer.

In view of the information already available, which placed Dunton "in his proper setting," and the substantial corroborative evidence, we conclude that the failure to require disclosure of Dunton's address did not deprive defendant of any substantial right.

2. ■ *Curtailment of the right of cross-examination.*

Dunton asserted his privilege against self-incrimination in the following areas: (1) his use of heroin after he got off parole, (2) his commission of thefts to support his narcotics habit, (3) his commission of a burglary which was the subject of a pending charge, (4) whether he was under the influence of heroin when he appeared before Judge Petty for issuance of the search warrant, (5) whether others he "turned" had sold him heroin, and (6) whether Dunton was the thief of an item found in the search of defendant's residence.

As to questions under 1, 2 and 3, defendant fails to demonstrate the relevancy and/or admissibility of the information sought to be elicited. As to item 1, Dunton was off parole in November 1979, whereas the events involved in this case occurred in March 1980. With respect to the burglary, such specific acts are inadmissible to attack credibility under Evidence Code sections 787 and 788. To the extent that the pending burglary charges were relevant to prove Dunton's motive, he admitted

on cross-examination that he believed his testimony would help him in his burglary case.

In any event, to the extent the information sought was relevant it was brought before the court by the reading of the transcript of the prior hearing. That transcript contained Dunton's admissions that he engaged in thefts to support his habit, that he had used heroin after he got off parole and even up to the time of defendant's arrest, and that he had stolen an item found in defendant's residence. The value of requiring him to repeat those admissions would have been negligible.

Defendant was not denied his right to cross-examine Dunton.

3. *Execution of the search warrant.*

Penal Code section 1531 provides: "The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute the warrant, if, after notice of his authority and purpose, he is refused admittance."

■ Defendant contends that Rodarte's entry into the house through the screen door failed to comply with section 1531, because he failed to demand entry and entry was made before he was refused entry. Neither contention is supported by the record. The officer announced himself three times and stated who he was and the purpose of his visit.

■ Penal Code section 1531 does not require a specific demand, only "notice of his authority and purpose." The statutory purpose is not that the officer must obtain a consensual entrance, but rather that the police not act so precipitously that the entrance violates privacy, endangers innocent persons who may be present, is conducive to violence or endangers the police who may be injured by a frightened householder. (See *Duke* v. *Superior Court* (1969) 1 Cal.3d 314, 321 [82 Cal.Rptr. 348, 461 P.2d 628].) Furthermore, the refusal of entry need not be verbal. The failure to respond within a reasonable time under the circumstances may constitute a refusal within the meaning of the statute.

In *People* v. *Elder* (1976) 63 Cal.App.3d 731 [134 Cal.Rptr. 212], this court upheld an entry to execute a search warrant for evidence of a bookmaking operation under circumstances similar to those in the present case. The officer, who knew that people were in the house, waited

20 seconds without receiving any response and then entered the residence. The court stated as follows: "An unreasonable delay in responding to the officer constitutes refused admittance. [Citation.] Marwin waited 20 seconds before entering because he was attempting to comply with the law and apparently it was either his general rule, or the general rule of his department, to wait 20 seconds to allow time to respond to a knock on a door. . . . [¶] Silence for 20 seconds where it is known that someone is within the residence suggests that no one intends to answer the door. Twenty seconds of silence may be sufficient in one case and insufficient in another. Other than the question of waiting only 20 seconds, there was full compliance with section 1531. It is our conclusion that under the circumstances of this case, silence for 20 seconds reasonably allowed the officer to conclude that his demand for admittance was being declined. This is particularly true in light of the fact the officer knew at that time that a crime was being perpetrated inside the residence." (*People* v. *Elder, supra,* 63 Cal.App.3d at p. 739.)

█ Similarly, in the present case, the officer not only knew someone was in the house but could see them, and was clearly visible to them through the screen door. He knocked and announced himself three times, but none of them moved or spoke. We conclude that under these circumstances the occupants' silence and inaction for 30 seconds allowed the officer reasonably to conclude that he was being refused admittance. In view of the nature of the material described in the warrant, it would be reasonable to conclude that the reason for the delay was to allow the destruction or concealment of the evidence of crime. (See also *People* v. *Valdivia* (1980) 114 Cal.App.3d 24, 27-28 [170 Cal.Rptr. 431].)

Defendant also contends that the entry was unlawful because the initial entry into the garage was made without compliance with the knock-notice requirements.

Clearly an attached garage (or even an unattached garage) is a part of a house, and normally there is an expectation of privacy that protects such areas from unauthorized entry. Moreover, it has been held that officers serving an arrest or search warrant must comply with the knock-notice requirements of sections 844 and 1531 prior to making entry. (See *People* v. *Bruce* (1975) 49 Cal.App.3d 580, 587 [122 Cal.Rptr. 648], entry into detached garage; and see *People* v. *Superior Court* (*Arketa*) (1970) 10 Cal.App.3d 122, 126-127 [89 Cal.Rptr. 316], entry into detached shed.)

Furthermore, an open door does not, standing alone, justify the failure to comply with the knock-notice requirements of Penal Code sections 844 and 1531. (See *People* v. *Buckner* (1973) 35 Cal.App.3d 307, 313-314 [111 Cal.Rptr. 32].)

Appellant contends that defendant's use of the garage as the primary entry into his residence, through the door located in the garage, changed its character, and therefore, the expectation of privacy associated with it in this case. The evidence reveals that the use of this means of entry was notorious and continuous, the garage door was kept open, and there were no cars located in the garage. Under these circumstances, the garage merely served the function of a front porch. We agree.

Moreover, it was not used by the police officer as an entry into the house. There was no search conducted in that area, and the knock-notice requirement was carefully observed at the screen door. In view of the use generally made of this entry, it is unlikely that the householder would take alarm at finding anyone, including police officers, at this door. Consequently, the primary purpose of section 1531 was served by the procedure followed.

We conclude that there was substantial compliance with the requirements of section 1531.

4. ■ *The search warrant.*

In *Theodor* v. *Superior Court* (1972) 8 Cal.3d 77, 101 [104 Cal. Rptr. 226, 501 P.2d 234], the Supreme Court stated: "In general, the burden is on the defendant to raise the issue of illegally obtained evidence. [Citations.] Thus if the defendant attempts to quash a search warrant, as defendant here seeks to do, the burden rests on him. [Citation.]"

Defendant failed to meet that burden in this case. There were omissions. However, it does not appear that they were either intentional for the purpose of misleading, or of such significance that they misled the magistrate in any way.

The most significant omissions dealt with details of Dunton's criminal record. The materiality of such omissions was addressed by the California Supreme Court in *People* v. *Kurland* (1980) 28 Cal.3d 376 [168

Cal.Rptr. 667, 618 P.2d 213], cert. den. (1981) 451 U.S. 987 [68 L.Ed.2d 844, 101 S.Ct. 2321], as follows: "All familiar with law enforcement know that the tips they [police informers] provide may reflect their vulnerability to police pressure or may involve revenge, braggadocio, self-exculpation, or the hope of compensation. [Citations.] The details of their criminal pasts are not necessary to place the magistrate on notice of their potential unreliability. [Citation.] [¶] Both an issuing magistrate and a reviewing court must initially assume that information from such sources is unreliable for purposes of probable cause. Such a rule alerts the magistrate to the very danger defendant urges—that the statements of tipsters from 'criminal society' may receive unwarranted weight. [¶] We therefore conclude that, in most cases, the issue of possible unreliability is adequately presented to the magistrate when the affidavit reveals that the affiant's source of information is not a 'citizen-informant' but a garden-variety police tipster. In such circumstances, predictable details of the informer's criminal past will usually be cumulative and therefore immaterial." (*People v. Kurland, supra*, at pp. 393-394.)

The affidavit adequately revealed the fact that Dunton was no "citizen-informant," but rather a common "garden-variety police tipster." It revealed that Dunton was an informant who was being paid for information and was searched before "buys." There is no reasonable probability that the details of his criminal record would have altered a reasonable magistrate's probable cause determination. (*People v. Kurland, supra*, at p. 385.)

The order dismissing the information pursuant to Penal Code section 995 is reversed.

Gardner, P. J., and Tamura, J.,* concurred.

Respondent's petition for a hearing by the Supreme Court was denied March 17, 1982.

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.